**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| DAMASCUS CITIZENS FOR SUSTAINABILITY, | ) ) ) | No.: 2:23-cv-00061 |
|  | ) |  |
| *Plaintiffs,* | ) ) |  |
| v. | ) ) |  |
| THE DELAWARE RIVER BASIN COMMISSION, | ) ) ) |  |
|  | ) |  |
| *Defendant.* | ) ) |  |

_____

**COMPLAINT**

Damascus Citizens for Sustainability files this Complaint and avers as follows:

**INTRODUCTION**

1.     Damascus Citizens for Sustainability brings this Complaint seeking declaratory and injunctive relief in regard to the Delaware River Basin Commission's ("DRBC") new regulations governing inter-basin transfers (importation and exportation) of water from the Basin, and of oil and gas waste and wastewater from outside the Basin.

2.     The DRBC has, *inter alia*, violated both the Compact by which it was created and its own rulemaking directive, created extra-regulatory exemptions from its new rules without any public notice, comment or hearing, and created substantial risks of pollution and other harm to Basin residents, particularly those closest to where oil

1

and gas development and operations are already occurring outside the Basin in Pennsylvania, or along routes used to transport oil and gas waste and wastewater.

3.      By allowing oil and gas waste and wastewater into the Basin, and also creating an exemption for "conventional" well wastewater roadspreading without any public input or any scientific basis, the DRBC has lowered the standard of protection for Basin residents below what has existed for years, and created a regulatory mess that essentially makes its new rules almost meaningless.

4.      As set forth more particularly in this Complaint, Damascus Citizens for Sustainability seeks various and alternative forms of declaratory and injunctive relief to address the different violations of the law perpetuated by the DRBC and its new rules.

## PARTIES

5.      Plaintiff Damascus Citizens for Sustainability, Inc. ("DCS") is a 501(c)(3) non-profit, grassroots organization established in 2008 to protect the Delaware River Basin and watershed from the risks associated with oil and natural gas exploration, production, processing and transportation (collectively "oil and natural gas development and operations" or "fossil fuel development") and to promote the health and prosperity of communities in the Delaware River Basin.

6.      DCS is dedicated to protecting clean air, land, and water from pollution caused by the fossil fuel extraction industry, including oil and gas operations. DCS works to provide individuals and communities directly or potentially threatened by fossil fuel extraction processes with the tools necessary to defend themselves.

7.     To this end, DCS routinely provides individuals in Pennsylvania and across the country (and internationally) with information about the way fossil fuels are extracted, processed, transported, and the like; the risks those processes pose to human health and the environment in which residents live; and the federal, state, and local laws, regulations, and policies that govern fossil fuel extraction and related processes.

8.     DCS's membership base, which has over 4200 members, includes those who live, work, and recreate in the Delaware River Basin ("Basin"), and that visit family, and/or have property and businesses in the Basin.  Many members have livelihoods that depend on the Basin's ecological integrity, including clean water, air, and land and healthy wildlife and aquatic life.

9.     DCS's Director, Barbara Arrindell, is a DCS member who lives in Damascus Township, Pennsylvania, in the Basin and has directly participated in DCS's activities and testimony before DRBC and other entities regarding oil and gas development.

10.     Since DCS's inception, DCS has been highly involved in understanding the impacts and hidden costs of, and in pushing for better regulation and oversight of, oil and natural gas extraction, production, and transportation.  Such efforts have included a focus on the wastes produced at each stage and their subsequent disposal, whether to injection wells or landfills, into water sources, or onto land, including roadspreading (disposal on roads) of liquid waste from wells, (sometimes termed "brine") and other related wastes, which can directly impact DCS members and their physical and economic health and well-being.

11.     Examples of DCS's direct involvement in addressing and educating about the impacts of oil and gas extraction, production, and transportation include:

a. Sounding the alarm on the East Coast in 2008 and 2009 about hydraulic fracturing and oil and gas operations, with a series of meetings in Pennsylvania and New York in which DCS implored for a precautionary approach to what the industry presented as known technology, but in fact, was a new application and expansion of such technology.

b. In 2009, DCS focused on the impact of so-called exploratory wells in the Delaware River basin, including providing evidence of pollution through monitoring of wellsites.  DCS also advocated for the Delaware River Basin Commission ("DRBC") to shut-down a Wayne County (Pennsylvania) wellsite that was targeting the Marcellus layer while also causing pollution to surrounding lands and waterways.

c. Educating the National Park Service and the U.S. Fish and Wildlife Service to such end that both agencies pushed the DRBC for a full review of exploratory wells in the Basin;

d. Requesting hearings with allied organizations in 2010 before DRBC, with reports by experts, that ultimately resulted in the shutdown of all exploratory wells in the Basin;

e. Filing suit in federal court in 2011 with Delaware Riverkeeper Network regarding the DRBC's exploratory wells exemption;

f. Providing information and support to residents adversely affected by natural gas development, as well as educating the public and journalists on the risks and emerging science of such operations;

g. Filing numerous *amicus curiae* briefs supporting parties fighting for better regulation and control over oil and natural gas development and operations, including in litigation over "conventional" wastewater roadspreading (Exhibit P);

h. Intervening in key litigation, including to defend DRBC's regulatory authority, such as in <u>Wayne Land and Mineral Group v. DRBC</u> and the later appeal of the same; and

i. Testifying before DRBC and submitting comment letters as DCS, in addition to educating the public to comment on rulemakings and policies involving oil and gas development and related operations in the Basin.

12.    DCS submitted comments to DRBC on the rules under challenge in this litigation, and also testified at the hearings held during the rulemaking process.

13.    DCS and its members will be adversely affected by DRBC's proposed rules, which not only rollback protections that DCS has helped to fight for in the Basin, but also would directly affect the local environment, including water quality, that DCS members rely upon.

14.    Defendant DRBC is "an agency and instrumentality of the governments of the respective signatory parties" to the Delaware River Basin Compact ("Compact")[1],

---

[1] Available at https://nj.gov/drbc/library/documents/compact.pdf and attached as Exhibit A.

5

(Compact, Article 2.1), created to act as a basin-wide agency to carry out the many responsibilities set forth in the Compact, including: water quality and quantity management; drinking water protection; pollution control to protect the water and other resources of the Basin; flood and floodplain management; soil conservation; wildlife and aquatic life protection; uniformity of treatment of water users regardless of their location in the Basin; and numerous other obligations. See, e.g., Compact, Preamble, Article 1 - Section 1.3, Article 5 – Sections 5.1 and 5.2.

15.     The DRBC is only one of a few compact agencies in which the Federal government is a signatory party and member, along with the Basin states of New York, New Jersey, Delaware, and Pennsylvania.

16.     The DRBC's jurisdiction covers the entirety of the Basin.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction).

18.     This matter also arises under the Compact,[2] which governs the DRBC including its rulemaking authority, and thus this Court also has jurisdiction pursuant to Article 15.1(p) of the Compact, which states: "The United States district courts shall have original jurisdiction of all cases or controversies arising under the Compact . . . ."

19.     This Court has supplemental jurisdiction over any state law claims raised herein, as they are so related to the federal questions that such state law claims are part of the same case or controversy.

---

[2] 75 Stat. 688, Pub. L. 87-328 (Sept. 27, 1961).

20.     The Court may grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

21.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391.

**FACTUAL AND PROCEDURAL BACKGROUND**

**General Information on the DRBC**

22.     The DRBC was created in 1961 pursuant to the Compact, after several decades of voluntary cooperation by Basin states through an organization called INCODEL (an acronym for Interstate Commission on the Delaware River Basin).

23.     All four Basin states – New York, New Jersey, Pennsylvania, and Delaware – and the federal government are signatory parties to the Compact, and are members of the DRBC.

24.     The Compact directs that the DRBC fulfill many obligations, one of which is the creation, management, and updating of a Comprehensive Plan for the short and long-term use, management, development, and conservation of the water resources of the Basin. Compact, Article 3 – Section 3.1, Article 13.

25.     Under the Compact, "water resources" of the Basin is broadly construed and defined to "include water and related natural resources in, on, under, or above the ground, including related uses of land, which are subject to beneficial use, ownership or control." Compact, Article 1 – Section 1.2(i).

26.     As part of its many other obligations under the Compact and as part of implementing the Comprehensive Plan, the DRBC has, *inter alia*, enacted and

periodically updated a Water Code[3] for the Basin to manage water quantity, quality,

pollution, and conservation in the Basin; and also promulgated water quality

regulations[4] for the entire Basin. 18 C.F.R. Section 410.

### Overview of Modern Oil and Natural Gas Development in the Basin and the DRBC

27.     With the Marcellus Shale and related "unconventional" oil and gas boom

in the 2000s, the Delaware River basin came under pressure for oil and natural gas

development, predominantly in Pennsylvania and New York where industry-desired

formations are located.  Other Basin states, particularly in the downstream areas of the

Basin watershed, were potential receivers of waste and wastewater from oil and natural

gas development.

28.     So-called "exploratory well" development in the Basin began in the late

2000s, which DCS monitored and raised concerns about given resulting pollution

incidents and the fact that such wells were not necessarily "exploratory," but simply a

means to start exploiting oil and natural gas resources in the Basin without attracting

too much attention.

29.     After a series of decisions by the DRBC Executive Director, hearings on

exploratory wells sought in part by DCS and in which DCS participated, and additional

litigation, the DRBC sought to promulgate regulations in 2011 to govern the booming

oil and gas development activity.

---

[3] https://nj.gov/drbc/library/documents/watercode.pdf
[4] https://nj.gov/drbc/library/documents/WQregs.pdf

30.     The DRBC did not act to finalize its regulations in 2011, and instituted a *de facto* moratorium on oil and natural gas development in the Basin that lasted for approximately a decade.

31.     During the years of the DRBC's *de facto* moratorium, New York banned oil and gas development that used high-volume hydraulic fracturing after an environmental impact study process.

32.     Concerns and science that led New York to ban such activities included, *inter alia*, the significant threat to New York City's drinking water, and data and studies, many of which came from what happened in Pennsylvania.[5]

33.     Pennsylvania allowed oil and gas development to explode across the state, resulting in a wide range of problems; as mere examples, the following occurred:

      a. illegal discharges of shale gas, coalbed methane, and in some instances other oil and gas development wastewater through publicly-owned sewage treatment plants, which contaminated waterways with high levels of, *inter alia*, total dissolved solids ("TDS") and bromides to the point that industries using water from contaminated waterways (such as the Monongahela River)[6] complained about corrosion to their equipment and drinking water treatment facilities had to switch their chlorination/disinfection chemicals to avoid violating drinking water standards.  So much oil and gas wastewater was discharged to South Fork

---

[5] https://www.nytimes.com/2014/12/18/nyregion/cuomo-to-ban-fracking-in-new-york-state-citing-health-risks.html
[6] http://www.uppermon.org/news/Pgh-Alleg/PG-DEP_seeks-22Oct08.htm

Tenmile Creek near Waynesburg, Pennsylvania that the Pennsylvania Department of Environmental Protection ("PADEP") found that the creek was turning into a saltwater environment.

b. After the PADEP called for oil and gas companies to voluntarily halt sending wastewater to publicly-owned sewage treatment plants, companies began trucking much of the wastewater to Ohio and other states to dispose of in injection wells. Recent efforts have been made to allow for disposal via injection well in Pennsylvania, despite a general historical understanding that Pennsylvania's geology is not suitable injection well disposal;

c. Discharges of oil and gas wastewater, including wastewater from so-called "conventional wells", continued to occur through privately-owned "centralized waste treatment" plants or "CWTs" incapable of properly treating the variety of pollutants in the wastewater. Studies downstream of such CWTs in the Allegheny River watershed found increased levels of radioactivity in the soils most directly in the path of the wastewater discharge (i.e. effluent) into the receiving waterways, demonstrating that wastewater from "conventional" operations posed similar risks to water quality and human health as shale gas wastewater;[7]

_____

[7] "Sources of Radium Accumulation in Stream Sediments Near Disposal Sites in Pennsylvania: Implications for Disposal of Conventional Oil and Gas Wastewater," Nancy Lauer, Nathaniel Warner, Avner Vengosh, *Environmental Science and Technology*, Jan, 4, 2018, DOI: 10.1021/acs.est.7b04952 (attached as Exhibit I).

d.   Challenges disposing of oil and gas well drill cuttings, mud, and other similar wastes from well development in municipal waste landfills[8] due to radioactivity or other high levels of oil and gas development pollutants;

e.   Adverse impacts on publicly-owned sewage plants, and in turn, local streams and rivers, due to inadequately-treated leachate discharges from landfills accepting oil and gas waste;[9]

f.   Erosion and sedimentation pollution of important headwater and trout streams;

g.   Water well contamination, and not just from fracking, but also from leaky wastewater impoundments and spills; most famously, Dimock residents went over a decade without clean water and with explosive levels of methane in their wells; other residents forced to prove the industry contaminated their wells faced an industry with deep pockets and a state agency that failed to side with the public they were charged to protect;

h.   Illegal dumping of wastewater that caused a massive kill of aquatic life ranging from gamefish to freshwater mussels in Dunkard Creek, stretching over 30 miles in the waterway;

i.   Sick and dead animals in areas where wastewater or spills occurred and animals ingested or came into contact with such fluids; and

---

[8] Under Pennsylvania law, solid wastes are classified as municipal waste, hazardous waste, or residual waste.
[9] https://stateimpact.npr.org/pennsylvania/2019/09/11/how-did-fracking-contaminants-end-up-in-the-monongahela-river-a-loophole-in-the-law-might-be-to-blame/ (Attached as Exhibit S)

j.  Health impacts on residents nearby from not just wellsites, but also new compressor stations, processing facilities, wastewater impoundments, and pipelines – both from water, air, and land pollution; as the science continues to evolve, data have revealed concerns over low-dose exposure, and the lack of accounting in regulatory regimes for exposure of sensitive populations (e.g. children, those with asthma or other respiratory or chronic health conditions, the elderly) to the variety of chemicals, particulate matter, and other pollutants emitted by oil and gas development and operations.[10]

34.  While much of the attention and spotlight on Pennsylvania focused on shale gas development, during the decade of the DRBC's *de facto* moratorium, oil and gas companies were increasingly using the combination of technologies of horizontal wellbores and high-volume hydraulic fracturing in: (1) shallower formations closer to drinking water sources; and (2) more "traditional", non-shale formations that had been targeted over the course of Pennsylvania's history with oil and gas development.

35.  Despite the fact that the newer technologies used on these other wells varied little from what companies used on tighter, shale gas formations, and that the pollution risks also varied little, Pennsylvania chose to regulate what it called

---

[10] See also, Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking and Associated Gas and Oil Infrastructure, April 2022, Eighth Edition of https://psr.org/wp-content/uploads/2022/04/compendium-8.pdf.
    This is a comprehensive collection and summary of research and other observations regarding oil and gas development and operations and the risks posed to human health and the communities in which people live, work, and recreate.  Due to size, the Compendium cannot be attached as an Exhibit to this Complaint, but is incorporated herein as if it were attached.

"conventional" wells less stringently than "unconventional" wells, and based the distinction between the two types of operations largely on the target formation.

36.     Specifically, in Act 13 of 2012, and later in the PADEP's attempted update[11] to its oil and gas regulations, an "unconventional well" is a "[a] bore hole drilled or being drilled for the purpose of or to be used for the production of ***natural gas*** from an ***unconventional formation***." 58 Pa.C.S. § 3203 (emph. added).

37. An "unconventional formation" is:

> A geological <u>***shale formation***</u> existing ***below the base of the Elk Sandstone or its geologic equivalent stratigraphic interval*** where natural gas generally cannot be produced at economic flow rates or in economic volumes except by vertical or horizontal well bores stimulated by hydraulic fracture treatments or by using multilateral well bores or other techniques to expose more of the formation to the well bore.

58 Pa.C.S. § 3203 (all emph. added).

38.     In other words, an unconventional well under Pennsylvania law would be limited to a well targeting, and seeking to extract natural gas from, generally speaking, a deep shale formation from which such natural gas can *only* be economically produced by using the listed technologies (e.g. hydraulic fracturing and horizontal wellbores).

39.     Everything else (e.g. natural gas wells shallower than the listed formations, natural gas wells in locations where there is no "stratigraphic equivalent" to the Elk Sandstone such as Basin areas in eastern Pennsylvania, oil extraction wells, and/or coalbed methane wells) could all be classified as "conventional", even if they

---

[11] The oil and gas industry challenged many components of the updated regulations, resulting in their temporary or permanent injunction.

used the *same* technologies as an "unconventional well" and thus had similar wastes, wastewater, and pollution risks.[12]

40.     Pennsylvania prohibited the land disposal of wastewater from "unconventional" wells, but continued to allow such disposal of similar wastewater from "conventional" wells for years.

41.     The practice of "conventional" well wastewater roadspreading came under challenge recently, and has allegedly been halted, but efforts continue to seek to allow such disposal under the guise of a "beneficial use" under Pennsylvania law.[13]

42.     Pennsylvania has no centralized, reliable oil and gas waste and wastewater tracking system, and records may vary between the Solid Waste Division of PADEP and PADEP's Oil and Gas Bureau.

43.     There is also no federal or federally-mandated oil and gas waste or wastewater tracking system, due to exemptions for wastes from oil and gas exploration and production under the Resource Conservation and Recovery Act ("RCRA") and pursuant to the 2005 Energy Policy Act, despite the well-documented toxic nature of such wastes.

44.     Thus, there is no real way to confirm what waste or wastewater from which wellsite is being disposed of where and how.

---

[12] The U.S. Energy Information Agency says that up to 95% of all new oil and gas wells are fracked. https://www.api.org/news-policy-and-issues/hydraulic-fracturing

[13] Also, the PADEP's waste facility database still lists approximately 88 counties/townships as using oil and gas wastewater for roadspreading.  It is not clear if this is a regulatory artifact, or if roadspreading continues in these areas. (Database printout attached as Exhibit F).

45.     There is no mechanism by which PADEP could identify a waste or wastewater truck as carrying "conventional" or "unconventional" well waste or wastewater; further, if a truck is combines waste or wastewater from multiple wellsites – unconventional and conventional - to completely fill the truck's load capacity, there is no directive as to how to classify such waste or wastewater under Pennsylvania law.[14]

46.     Pennsylvania has no general manifesting system for oil and gas waste or wastewater, and the PADEP's Form 26R, if filled out by a waste generator at all, is only an annual report of waste that fails to represent what comes out of a given wellsite or other related oil and gas operation.

47.     The PADEP expressly states as to its databases on oil and gas waste and wastewater:

> While the Oil and Gas Program requires accurate data reported by Operators, the Department of Environmental Protection makes no claims, promises or guarantees regarding the accuracy, completeness or timeliness of the data. DEP will make every attempt to correct any errors discovered but expressly disclaims any liability for errors or omissions related to the data contained within these reports.[15]

48.     Continued problems exist with disposal of oil and gas wastes and wastewater, with one example being as recent as 2019, when the Belle Vernon public

---

[14] In essence, this is similar to the Schrödinger's box thought experiment, but with a truck full of oil and gas wastewater and/or wastes.
[15] https://files.dep.state.pa.us/OilGas/BOGM/BOGMPortalFiles/OilGasReports/HelpDocs/SSRS_Report _Data_Dictionary/DEP_Oil_and_GAS_Reports_Data_Dictionary.pdf (Relevant excerpt attached as Exhibit R).

sewage treatment plant discovered its operations were being harmed by inadequately-pretreated leachate wastewater from a landfill accepting oil and gas waste.[16]

49.     Against this background, the DRBC, in February 2021, finalized regulations that prohibited "high-volume hydraulic fracturing" ("HVHF") in hydrocarbon-bearing rock formations in the Basin. 18 C.F.R. Sections 440.2, 440.3.

50.     However, at that time, the DRBC did not issue regulations governing water exports for oil and gas development outside the Basin, or import of waste and wastewater into the Basin. Resolution 2021-01.[17]

51.     The DRBC issued a resolution for its minutes dated February 25, 2021,[18] directing the DRBC Executive Director to, *inter alia*, "prepare and publish for public comment a set of amendments to the Comprehensive Plan and implementing regulations to update its policies and provisions concerning inter-basin transfers of water and wastewater from and to the Delaware River Basin." February 25, 2021 Resolution for the Minutes ("2-25-2021 Minutes Resolution").[19]

**DRBC Proposed Rulemaking on Oil and Gas Waste and Wastewater**

52.     In November 2021, the DRBC published a Notice of Proposed Rulemaking and Public Hearing for proposed rules covering: "importations of water into and

---

[16] https://stateimpact.npr.org/pennsylvania/2019/09/11/how-did-fracking-contaminants-end-up-in-the-monongahela-river-a-loophole-in-the-law-might-be-to-blame/ (Attached as Exhibit S)

[17] https://www.nj.gov/drbc/library/documents/Res2021-01_HVHF.pdf

[18] https://www.nj.gov/drbc/library/documents/ResForMinutes022521_regs-transfers.pdf (Attached as J).

[19] The original deadline for proposed rules was September 30, 2021; by resolution dated September 9, 2021, the DRBC extended the deadline for proposed rules to November 30, 2021. https://www.nj.gov/drbc/library/documents/ResForMinutes090921_import-export-extension.pdf

exportations of water from the Delaware River Basin; [and] discharges of wastewater from high volume hydraulic fracturing and related activities."[20]

53.     Prior to the promulgation of the rules challenged herein, the DRBC had never approved *any* "transfers of water and/or wastewater from or into the Delaware River Basin" for HVHF or HVHF-related activities. (2-25-2021 Minutes Resolution).  It likewise regularly "conditioned its approvals of wastewater discharge projects on a requirement that no importation, treatment and/or discharge of hydraulic fracturing wastewater may be undertaken by the docket holder without the Commission's prior review and approval." (2-25-2021 Minutes Resolution).  No water was allowed to be exported for HVHF elsewhere either.

54.     Under the rules proposed by DRBC in November 2021, the DRBC proposed to prohibit the "discharge [of] wastewater from high volume hydraulic fracturing or HVHF-related activities to waters or land within the Basin."[21]

55.     High-volume hydraulic fracturing, or HVHF, was defined in the DRBC's 2021 rulemaking under 18 C.F.R. Section 440.2, as:

> hydraulic fracturing using a combined total of 300,000 or more gallons of water during all stages in a well completion, whether the well is vertical or directional, including horizontal, and whether the water is fresh or recycled and regardless of the chemicals or other additives mixed with the water.

---

[20] https://www.nj.gov/drbc/library/documents/ProposedRulemaking/import-export_102821/PA_Bulletin_Notice_ImportExport-HVHFdischarge120421.pdf (Attached as Exhibit B).
    *Note*: although the DRBC published the proposed rules in the Federal Register, the copy of the notice available through the DRBC's website shows that the DRBC failed to publish the entirety of the proposed rules in the Federal Register on November, 22, 2021, and that the incomplete language of the proposed rules in the Federal Register diverges from the language published in the Pennsylvania Bulletin.
[21] https://www.nj.gov/drbc/library/documents/ProposedRulemaking/import-export_102821/PA_Bulletin_Notice_ImportExport-HVHFdischarge120421.pdf, p. 7479 (Exhibit B).

56.     The proposed rules introduced two new defined terms relevant to the proposed prohibition on wastewater discharges: "HVHF-related activities," and "Wastewater from high volume hydraulic fracturing".

57.     The proposed definition of "HVHF-related activities" was:

> (1) Construction of an oil or natural gas production well that is to be stimulated using HVHF as defined herein;
> (2) Chemical mixing or storage of proppant, chemicals and other additives to make fracturing fluid; and
> (3) Management of wastewater from hydraulic fracturing, including storage, disposal, treatment, or reuse in hydraulic fracturing operations or other uses.[22]

58.     The proposed definition of "wastewater from high volume hydraulic fracturing" was:

> (1) *Any wastewater, brine*, sludge, chemicals, naturally occurring radioactive materials, heavy metals or other contaminants that have been used for or *generated by high volume hydraulic fracturing or HVHF-related activities*;
> (2) Leachate from solid wastes associated with HVHF-related activities, except if the solid wastes were lawfully disposed of in a landfill within the Basin prior to the effective date of this rule; and
> (3) Any products, co-products, byproducts or waste products resulting from the treatment, processing or modification of the wastewater described in paragraphs (1) and (2) of this same definition.[23] (emph. added).

---

[22] https://www.nj.gov/drbc/library/documents/ProposedRulemaking/import-export_102821/PA_Bulletin_Notice_ImportExport-HVHFdischarge120421.pdf  p.7478 (Exhibit B).
[23] https://www.nj.gov/drbc/library/documents/ProposedRulemaking/import-export_102821/PA_Bulletin_Notice_ImportExport-HVHFdischarge120421.pdf  p.7478-7479 (Exhibit B).

59.     The proposed rules also would have added language to ensure consistency between the DRBC's water quality regulations and the DRBC Water Code regarding the proposed discharge prohibition.[24]

60.     Thus, under the proposed rules, the discharge, including land disposal of wastes/wastewater from so-called "conventional" wells that were developed with HVHF, would have been prohibited.

61.     The proposed rules also included provisions to govern applications seeking DRBC approval to import wastewater into the Basin, in addition to provisions pertaining to water/wastewater exports, the latter of which (exports) is not presently at issue in this matter.[25]

62.     The approval application rules for import of waste and wastewater would directly conflict with not only the status quo prior to these final rules, but also the DRBC's stance on oil and gas operations to this point.

63.     Despite recognizing the difficulty to near-impossibility of adequate treatment of oil and gas wastes and wastewater, and thus the need to prohibit discharges altogether, the DRBC still proposed to leave the door open for discharges in the future via the approval application regulations, as evidenced by the requirement that an application for wastewater importation demonstrate, *inter alia*, "the

---

[24] https://www.nj.gov/drbc/library/documents/ProposedRulemaking/import-export_102821/PA_Bulletin_Notice_ImportExport-HVHFdischarge120421.pdf, p.7477. (Exhibit B).

[25] https://www.nj.gov/drbc/library/documents/ProposedRulemaking/import-export_102821/PA_Bulletin_Notice_ImportExport-HVHFdischarge120421.pdf, p.7477 (Exhibit B).

characterization and treatability of the wastewater." Proposed Section 2.30.3.B.2. of the

DRBC Water Code.

64.     This is in addition to the fact that, while DRBC recognized the dangers

and hazards of HVHF and related activities, including discharges of waste and

wastewater from such activities, DRBC proposed to allow oil and gas wastewater and

waste into the Basin, perhaps for processing, storage, or other "non-discharge"

activities, which still brings the very same risks of pollution into the Basin that the

DRBC has, thus far, consistently prohibited.

### DRBC Final Rulemaking on Oil and Gas Waste/Wastewater

65.     After multiple hearings and comments received, the DRBC issued its final

regulations on December 7, 2022.

66.     Final Part 440 contained mostly similar language to the proposed rule,

with the following relevant exceptions under Section 440.2:

   a.  The defined term "wastewater from high volume hydraulic fracturing"

       was expanded to: "Wastewater from HVHF *and HVHF-related activities*"

       (emph. added) and the definition altered to the following (bold italics

       emphasis denotes added/replaced terms by DRBC)[26]:

          (1) Any wastewater, brine, *or* sludge *containing*
          chemicals, naturally occurring radioactive materials,
          heavy metals or other contaminants that have been
          used for or generated by high volume hydraulic
          fracturing or HVHF-related activities;
          (2) Leachate from solid wastes associated with HVHF-
          related activities, except if the solid wastes were
          lawfully disposed of in a landfill within the Basin prior

---

[26] To clarify, the bracketed language ("[insert date 30 days . . . ]" is in the final rule announced by DRBC.

to **[INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER]**; and
(3) Any products, co-products, byproducts or waste products resulting from the treatment, processing or modification of the wastewater described in paragraphs (1) and (2) of this definition.

b. Addition of a new term ("Discharge of wastewater from HVHF and HVHF-related activities") and its definition:

an intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying, spreading, spraying, injecting, leaching, dumping, or disposing of such wastewater to waters or land within the Basin, and including the abandonment or discarding of barrels, containers, and other receptacles containing such wastewater.[27]

67.     The finalized Section 440.2 definitions only further strengthened the rules' broad applicability to wastewater and wastes from oil and gas wellsites, including wastewater from "conventional" wellsites, and the wholesale prohibition on discharges of any kind of such substances, including land application/disposal of wastewater containing brine on roads.[28]

68.     The breadth of the final rules likewise matched the breadth of the directive from DRBC to the Executive Director in the 2-25-2021 Minutes Resolution.

---

[27] https://www.nj.gov/drbc/library/documents/regs/18CFR_Part440_final-to-proposed.pdf (Attached as Exhibit D).

[28] Final Section 2.30.3.B. on applications for wastewater imports likewise retained substantially the same language as proposed Section 2.30.3.B.
https://www.nj.gov/drbc/library/documents/regs/WaterCode2.30_final-to-proposed.pdf (Attached as Exhibit C).

69.     The final rules, as written, also would have established some consistent level of protection across the Basin in regard to oil and gas waste and wastewater, in keeping with the purpose of the DRBC and the Compact, even though it was still a lower level of protection than the status quo (i.e. a categorical prohibition on waste and wastewater importation).

70.     Unfortunately, the DRBC did not stop at the words on the pages of its final regulations, and instead, when promulgating its final rules, immediately announced multiple extra-regulatory exemptions from its new rules without any public notice, hearing, or comment.

71.     The exemptions are "extra-regulatory" because they are not included in the regulations themselves, and were never included in the notice of proposed rulemaking, but rather DRBC announced the exemptions on December 7, 2022 in its final rules comment response document ("CRD")(Exhibit E), its notice of final rules (Exhibit K), and in its FAQs on the final rules (Exhibit L).

72.     The extra-regulatory exemptions directly undermine, if not make useless, the new rules.

73.     One such exemption or perhaps extra-regulatory clarification, is that the DRBC is not categorically prohibiting the importation of oil and gas waste and wastewater; rather it is merely prohibiting its discharge to land and water.  This still lowers the level of protection for Basin users from the status quo and raises questions about what exactly would be allowed to occur in the Basin.

74.     Of particular concern to DCS, however, is the DRBC's extra-regulatory exemption that there is no prohibition on "road spreading of wastewater from conventional drilling activities, an activity not within the scope of DRBC's proposed rulemaking." (DRBC Notice of Final Rules (Exhibit K), <u>see also</u> CRD for the final rules (attached as Exhibit E.)

75.     As already explained, the definitions in both the proposed and final rules clearly encompassed wastewater/waste from all wellsites involving high-volume hydraulic fracturing.  The U.S. Energy Information Agency says that up to 95% of **all** new oil and gas wells (regardless of "unconventional" or "conventional" designation) are fracked.[29]

76.     The DRBC, after the close of public notice, comment, and hearings, decided to backtrack on what it had proposed in what could be seen as attempt to satisfy a segment of the oil and gas industry; however, simply saying that a particular activity was not within the scope of the proposed rulemaking does not make it so. Exhibit E, K.

77.     The exemptions were not in the notice of proposed rulemaking. Exhibit B.

78.     Further, when DRBC created the extra-regulatory conventional wellsites exemption at the end of the rulemaking process, it failed to specify how anyone – DRBC, Basin residents, DCS members that would be affected by the new exemption – is supposed to determine when a waste or wastewater falls within the exemption.

79.     As described *supra*, Pennsylvania lacks any means for making such

---

[29] https://www.api.org/news-policy-and-issues/hydraulic-fracturing

determinations, much less tracking the waste and the wastewater.

80.     There is also no scientific or other principled mechanism by which to determine when wastewater from a wellsite is from hydraulic fracturing activity or is simply liquids returned to the surface from formation layers (i.e. "brine"), because hydraulic fracturing activity necessarily releases "brine" or "formation water" in the process, and whatever fracking fluid substance was pumped downhole into the wellbore is going to come back up mixed with wastewater released from the formation itself.

81.     Drawing a line between what is just "brine" and what the words of the DRBC's final rules cover would be simply arbitrary, and yet that is precisely what DRBC has done – drawn an arbitrary line.

82.     To make matters worse, DRBC cross-referenced Pennsylvania's "unconventional" well definition in describing its extra-regulatory exemption.

83.     As explained *supra*, Pennsylvania's definitions exclude many types of wellsites and oil and gas operations from qualifying as "unconventional,"; however, the DRBC's regulations would have encompassed all of them.

84.     The DRBC, in its extra-regulatory exemptions, has no means of how anyone – DCS members living in the basin, other Basin residents and businesses, etc. – is supposed to figure out what it actually means now in its final regulations and what activities are prohibited.

85.     Further, despite the language of its own regulations, DRBC stated in its extra-regulatory exemptions that it is not categorically barring the importation of waste

and wastewater, ignoring that it is now inviting in waste and wastewater, previously not permitted into the Basin, that it is obligated to protect against, and has done so in such a way that is arbitrary, lacking in any scientific or other support, exclusionary of required public involvement, increases the risk to water resources of the Basin and water users through spills, leaks, and illegal dumping, and violative of the Compact and the DRBC's own rulemaking directive, and that undermines Pennsylvania law.

## CLAIMS

86.     DCS incorporates the foregoing paragraphs as if fully set forth herein.

## COUNT ONE
### Violation of Compact, Article 5 – Section 5.2, Article 14 – Sections 14.2, 14.4
### Failure to Follow Proper Rulemaking Process

87.     DCS incorporates the foregoing paragraphs as if fully set forth herein.

88.     The DRBC failed to follow the proper rulemaking process on its last-minute, extra-regulatory exemptions. Compact, Article 5 – Section 5.2, Article 14 – Sections 14.2, 14.4; Exhibits E, K, L.

89.     The DRBC failed to put the public on notice of the extra-regulatory exemptions it announced with the final rules, including the extra-regulatory exemption for conventional brine roadspreading.

90.     The DRBC's notice of proposed rulemaking says nothing about exemptions or carveouts to the rules that DRBC proposed.[30]

---

[30] https://www.nj.gov/drbc/library/documents/ProposedRulemaking/import-export_102821/PA_Bulletin_Notice_ImportExport-HVHFdischarge120421.pdf (Exhibit B).

91.    For example, in the DRBC's FAQ on the *proposed* rules, Item #13 leads a

person who reads the proposed rules to understand that DRBC would have prohibited

roadspreading of brine, regardless of the originating wellsite.[31]

92.    However, upon announcing the final rules, the DRBC – in its notice of

final rules, final rules FAQ, and Comment Response Document ("CRD"), identified

multiple exemptions from its final rules that are neither in the final rules themselves, or

in the proposed rules. (Exhibits E, K, L).

93.    Indeed, the CRD is illogical when it says that prohibition of management

of brines from conventional drilling (including roadspreading) were beyond the scope

of the notice of proposed rulemaking. (Exhibit E - CRD, p.65).

94.    The definitions under the proposed rules clearly subsumed such wastes.

The DRBC created an exemption out of thin air with no notice, public comment, or

hearings.

WHEREFORE, DCS respectfully requests that this Court enter an order: (1)

declaring the DRBC's extra-regulatory exemptions void and contrary to the Compact;

(2) declaring that the regulations to be followed consist only of the regulations set forth

in the revised Water Code, revised Part 440 to Title 18 of the U.S. Code of Federal

Regulations, and the revised Water Quality Regulations; and (3) enjoining the

application of any of the extra-regulatory exemptions; and (4) (a) directing the DRBC to

conduct a rulemaking to prohibit importation of oil and gas waste and wastewater into

the Basin; and (b) prohibiting the importation into the Basin of all oil and gas waste and

---

[31] https://www.nj.gov/drbc/library/documents/ProposedRulemaking/import-export_102821/FAQ_import-export_proposed-rules.pdf  (Attached as Exhibit M).

wastewater until the DRBC completes a new rulemaking; or in the alternative, (c)

prohibiting the importation into the Basin of all oil and gas waste and wastewater.

## COUNT TWO
### Violation of 2-25-2021 Minutes Resolution (the rulemaking directive)

95.     DCS incorporates the foregoing paragraphs as if fully set forth herein.

96.     For the reasons set forth in Counts I, III, IV, and V, the DRBC's rules

violate the directives of the 2-25-2021 Minutes Resolution (attached as Exhibit J).

97.     Further, and in particular, the 2-25-2021 Minutes Resolution's directive

was broad, and directed, *inter alia*,

> "The proposed rule amendments directed by this Resolution
> ***shall include and the public notice shall solicit comment*** on:
>      . . .
> b.  Conditions under which an importation of
> wastewater into the Basin may be prohibited;
> c.  ***Any other provisions*** concerning inter-basin
> transfers of water and wastewater that commenters
> believe are necessary and appropriate to protect the
> public health or to preserve the waters of the Basin for
> uses in accordance with the Comprehensive Plan."

Exhibit J – 2-25-2021 Minutes Resolution (emph. added).

98.     The DRBC's extra-regulatory exemptions issued with its final rules were

not included in the public notice of proposed rulemaking and thus not put to public

comment.

99.     Likewise, the exemptions directly conflict with the Resolution's directive

to address "***[a]ny other provisions*** concerning inter-basin transfers of . . . wastewater

that commenters believe are necessary and appropriate to protect the public health or to

preserve the waters of the Basin for uses in accordance with the Comprehensive Plan."

Exhibit J – 2-25-2021 Minutes Resolution (emph. added).

100.    This is particularly the case when commenters specifically told the DRBC to ensure that brine from conventional wells, and especially roadspreading (i.e. land disposal) of such waste/wastewater, would be covered in its final rules due to the documented threats posed by such activities to water quality, public health, and local communities – and yet DRBC literally did the opposite. See, e.g., CRD (Exhibit E).

WHEREFORE, DCS respectfully requests that this Court enter an order: (1) declaring the DRBC's extra-regulatory exemptions void and in violation of the DRBC's 2-25-2021 Minutes Resolution; (2) declaring that the regulations to be followed consist only of the regulations set forth in the revised Water Code, revised Part 440 to Title 18 of the U.S. Code of Federal Regulations, and the revised Water Quality Regulations; (3) enjoining the application of any of the extra-regulatory exemptions; and (4) (a) directing the DRBC to conduct a rulemaking to prohibit importation of oil and gas waste and wastewater into the Basin; and (b) prohibiting the importation into the Basin of all oil and gas waste and wastewater until the DRBC completes a new rulemaking; or in the alternative, (c) prohibiting the importation into the Basin of all oil and gas waste and wastewater.

## COUNT THREE
### Void for Vagueness

101.    DCS incorporates the foregoing paragraphs as if fully set forth herein.

102.    A law, rule, or regulation can be unconstitutionally vague if a person cannot determine what conduct is allowed or prohibited.

103.     DRBC's failure to define which activities it has not regulated under the challenged rules results in an abject lack of clarity for DCS members, who cannot know if, for instance, a truck spreading brine outside their homes is allowed to do so and in turn, adversely affect members' health, properties, pets, and their constitutional rights to the quiet use and enjoyment of their land and their rights protected under Article I, Section 27 of the Pennsylvania Constitution.

104.     The DRBC has no guidance, regulations, or any language at all to identify when waste may be classified as brines from conventional wellsites.

105.     The only possible hint is a reference in the CRD to Pennsylvania's definition of "unconventional"; however, the CRD equates the DRBC's definition of HVHF to Pennsylvania's definition of "unconventional", (Exhibit E – CRD, p.65) and neither definition resembles the other in any way.

106.     In short, the DRBC defines the activities subject to its new regulations based on the types of technology used; in contrast, Pennsylvania defines a select class of natural gas wells as "unconventional" based on *the target formation*, **not** solely the technologies used.  Thus, Pennsylvania law treats as "unconventional" a significantly smaller class of wellsites than the DRBC's new rules – except that now, outside of any public notice, comment, or hearing, the DRBC equated them in extra-regulatory documents.

107.     This leaves residents, landowners, and others in the Basin affected by the DRBC's new regulations subject to the whims of operators, trucking companies, and

multiple government agencies as to what may or may not be covered by the DRBC's new regulations.

108.    The DRBC's extra-regulatory exemptions created a loophole large enough to swallow the weight behind its new regulations.

109.    There is no centralized oil and gas waste or wastewater tracking system in Pennsylvania such that a person – whether a Basin resident or someone at DRBC – can identify a truck of waste or wastewater as coming from a conventional or unconventional wellsite.

110.    Also, a given waste or wastewater truck could be carrying material from multiple different sites, and neither the DRBC nor Pennsylvania has any directives by which to classify such waste as "conventional" or "unconventional."

111.    There is also no scientific or other principled mechanism by which to determine when wastewater from a wellsite is from hydraulic fracturing activity or otherwise released by hydraulic fracturing, or is "brine" coming out of the well due to some non-hydraulic fracturing activity or force.

112.    Further, now that the DRBC has, outside of notice and comment, effectively incorporated Pennsylvania's different definitions into DRBC's regulations, there is no clear principle by which to tell when the DRBC's new regulations apply to waste and wastewater from oil and gas development and when the Pennsylvania definitions apply.

      a.   As set forth earlier in this Complaint, the DRBC's regulations have several relevant interlocking definitions, all of which focus on the technologies

used and the oil and gas wastes and wastewater associated with oil and

gas development:

    i.  HVHF (high volume hydraulic fracturing);

    ii.  HVHF-related activities:

    iii.  Wastewater from HVHF and HVHF-related activities; and

    iv.  Discharge of wastewater from HVHF and HVHF-related activities.

b.  Pennsylvania's two relevant interlocking definitions, which the DRBC has

now, outside of the rulemaking process, relied upon, are the following:

    i.  The term "unconventional well", which is "[a] bore hole drilled or

being drilled for the purpose of or to be used for the production of

***natural gas*** from an ***unconventional formation***." 58 Pa.C.S. § 3203

(emph. added).

    ii.  "Unconventional formation," defined as:

> A geological ***shale formation*** existing below the
> base of the Elk Sandstone or its geologic
> equivalent stratigraphic interval where natural
> gas generally cannot be produced at economic
> flow rates or in economic volumes except by
> vertical or horizontal well bores stimulated by
> hydraulic fracture treatments or by using
> multilateral well bores or other techniques to
> expose more of the formation to the well bore.

58 Pa.C.S. § 3203 (emph. added).

113.    As explained *supra*, Pennsylvania's definitions exclude many types of

wellsites and oil and gas operations from qualifying as "unconventional,"; however, the

DRBC's regulations would have encompassed all of them.  The DRBC, in its extra-

regulatory exemptions, has no means of how anyone – DCS members living in the basin, other Basin residents and businesses, etc. – is supposed to figure out what it actually means now in its final regulations and what activities are prohibited or allowed.

114.    For example, if a truck carrying oil and gas waste to a landfill has collected material from both "conventional" and "unconventional" wellsites, the DRBC rules with the new extra-regulatory exemptions has no clear answer on how the discharge from that landfill is going to be regulated.

115.    Had the DRBC put the extra-regulatory exemption for conventional wellsite wastewater disposal properly through notice, comment, and hearings, commenters could have quickly pointed out that the DRBC's equating of its proposed regulatory definitions and Pennsylvania's existing definitions would make the DRBC's regulations practically meaningless and unintelligible.

116.    However, as stated already *supra*, the DRBC skipped this and revealed the exemptions well after all public involvement (i.e. hearings, comment deadlines) had been completed.

117.    Now, residents in the Basin, including DCS members, are left to wonder what exactly is going to be allowed to occur by their homes, where they recreate, and where they have invested their money and energy, given the abject lack of clarity created by the DRBC's new regulations and its extra-regulatory exemption for conventional well brines – something DCS members did not have to wonder about under the regulatory regime that existed prior to the new rules and the conventional oil

and gas wastewater extra-regulatory exemption.

WHEREFORE, DCS respectfully requests that this Court enter an order: (1) declaring the DRBC's extra-regulatory exemption for conventional wellsite brines, including roadspreading, as void for vagueness; (2) declaring that the regulations to be followed consist only of the regulations set forth in the revised Water Code, revised Part 440 to Title 18 of the U.S. Code of Federal Regulations, and the revised Water Quality Regulations; (3) enjoining the application of the conventional wellsite brines extra-regulatory exemption; and (4) (a) directing the DRBC to conduct a rulemaking to prohibit importation of oil and gas waste and wastewater into the Basin; and (b) prohibiting the importation into the Basin of all oil and gas waste and wastewater until the DRBC completes a new rulemaking; or in the alternative, (c) prohibiting the importation into the Basin of all oil and gas waste and wastewater.

## COUNT FOUR
### Violation of Compact – Article I
### Arbitrary, Unequal, and Non-uniform Treatment of Basin Water Users

118.    DCS incorporates the foregoing paragraphs as if fully set forth herein

119.    One of the central components of the Compact and the creation of the DRBC is to implement "the principle of equal and uniform treatment to all water users who are similarly situated and to all users of related facilities, without regard to established political boundaries." Compact, Article 1, Section 1.3(e).

120.    The DRBC's last-minute decision to create its extra-regulatory conventional brines carveout and to treat this subset of waste/wastewater and its impacts on water users of the Basin differently than everything else covered by its rule

disproportionately and adversely affects Pennsylvania residents, and subjects residents in other Basin states living in proximity to waste and wastewater facilities to the vagaries of the law of a state – Pennsylvania – that they do not even in live in.

121.    There is no data, analysis, or other information – either in the DRBC's CRD or otherwise – to support the DRBC's last-minute, extra-regulatory carveout for "conventional" oil and gas waste and wastewater and the lopsided harms the DRBC has now sanctioned for Basin residents predominantly in Pennsylvania.

122.    To the contrary, significant evidence points to the need to treat such wastes the same as whatever is presently covered by DRBC's final rule. See, e.g., Exhibits G through I, N through Q.

123.    In addition to the lack of any supportable principle or line to distinguish conventional wellsite waste and wastewater from other oil and gas waste/wastewater, the DRBC's last-minute decision to muddle its regulations with Pennsylvania's different legal regime creates unequal and non-uniform treatment of Basin water users particularly those in Pennsylvania including DCS members.

124.    Land disposal of conventional waste and wastewater is most common in Pennsylvania of all the Basin states, due to Pennsylvania's high level of oil and natural gas development compared to the other Basin states.

125.    Further, the DRBC's failure to institute a categorical prohibition on the importation of oil and gas waste and wastewater lowers the standard of protection for Basin water users below the status quo, in which DRBC has not allowed such activities.

126.    The importation of such material into the Basin will disproportionately and adversely harm those residents, particularly in Pennsylvania, closest to oil and gas activities where new waste and wastewater processing facilities may open and expose nearby residents to the well-documented harms and risks of spills, leaks, and other releases (even if not a "discharge") that presently they do not have to be concerned with. See, e.g., Exhibits G through I, N though Q.[32]

127.    Even the DRBC has recognized the harms of oil and gas activity to such an extent that it prohibited HVHF activities in the Basin – and yet, now it wants to allow in waste and wastewater from those same activities.

128.    The DRBC's regulations and actions are supposed to ensure uniformity across Basin water users, not entrench differential treatment, particularly without any basis for doing so, as is the case here.

WHEREFORE, DCS respectfully requests that this Court enter an order: (1) declaring the DRBC's extra-regulatory exemptions void and contrary to the Compact; (2) declaring that the regulations to be followed consist only of the regulations set forth in the revised Water Code, revised Part 440 to Title 18 of the U.S. Code of Federal Regulations, and the revised Water Quality Regulations; (3) enjoining the application of any of the extra-regulatory exemptions; and (4) (a) directing the DRBC to conduct a rulemaking to prohibit importation of oil and gas waste and wastewater into the Basin; and (b) prohibiting the importation into the Basin of all oil and gas waste and

---

[32] See also, Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking and Associated Gas and Oil Infrastructure, April 2022, Eighth Edition of https://psr.org/wp-content/uploads/2022/04/compendium-8.pdf.   .

wastewater until the DRBC completes a new rulemaking; or in the alternative, (c)

prohibiting the importation into the Basin of all oil and gas waste and wastewater.

**COUNT FIVE**
*Ultra Vires*
**DRBC Lacks the Authority under the Compact to set a Regulatory Floor Lower than the Laws of Any of Its Signatory Parties**

129.     DCS incorporates the foregoing paragraphs as if fully set forth herein.

130.     Nothing in the Compact grants the DRBC the authority to establish a

regulatory floor lower than any of the signatory parties' respective laws.

131.     Indeed, one of the very core purposes of the DRBC is to ensure equal and

uniform treatment of Basin water users regardless of where they live in the Basin,

meaning that the DRBC cannot simply choose to set a standard that undermines

existing state protections that are higher than what DRBC chooses to enact.  DRBC is

supposed to ensure a regulatory floor that is, at a minimum, no less than, if not higher

than, any of the individual signatory parties' laws.

132.     Under Pennsylvania law, it is a nuisance *per se* to pollute public

waterways. Machipongo Land & Coal Co. v. Dep't of Envtl. Prot., 799 A.2d 751, 774 (Pa.

2002).

133.     Multiple scientific studies conducted by different researchers have found

that land application of brines from conventional wells causes buildup of toxic metals,

salts, and radioactive materials in the soils on and around roadsides, which washes into

nearby streams, properties, and seeps into groundwater.[33] (Exhibits G, H, N, O, Q)

---

[33] The situation with land disposal of oil and gas liquid waste on Pennsylvania roads is not entirely unlike what occurred in Times Beach, Missouri, when a waste hauler mixed waste oil together with tank sludges from a company that manufactured Agent Orange.  The entire town was depopulated due to the

134.    Brines even from conventional wells contain a wide range of pollutants, including, *inter alia*, total dissolved solids, chloride, strontium, bromide, naturally-occurring radioactive material (e.g. radium), lithium, and manganese. (Exhibits G, H, N, O, Q).

135.    Studies have documented high levels of these pollutants in runoff from oil and gas brine-treated roads. (Exhibits G, H, N, O, Q).

136.    Further, when conventional well brines are applied to roads – which are usually unpaved, hence the use of the brines in the first place as an "alternative" dust suppressant[34] – the pollutants in the brines destabilize the roadbed, leading to faster breakdown and in turn washing away of the road (and pollutants built up in the road materials; further, the pollutants also react with clay soil (typical in Pennsylvania in many unpaved road areas) and create a sludge that sticks to just about anything that drives or walks through it, and can more easily be washed into local waterways during rain events. (Exhibits G, H, N, O, Q).

137.    When roads dry out, the brine-destabilized roads result in *greater* dust dispersion, but this time, with the brine-pollutants in addition to dust solely from

---

resulting accumulation of dioxin in and around roadways.  While the oil and gas industry is sure to dispute the similarity, there is no real oversight of oil and gas waste in such a way that would prevent waste haulers, wellsite contractors, or others involved in the oil and gas process from mixing different oil and gas wastes and wastewater.  Further, there is nothing in DRBC's regulations to determine how to classify such wastes once mixed, leaving a lot up to the waste hauler or operator to say whether the waste or wastewater being hauled is "conventional" and therefore exempt under the DRBC regulations, or subject to the regulations.  Common sense would say that if there is an exemption as vague and murky as what the DRBC has created, why would a company go to the trouble and extra cost of saying their waste or wastewater would be subject to the regulations.

[34] These studies have also shown that application of well brines are no better than rainwater at suppressing dust, while being significantly more toxic to human and animal health.

roadbed materials, spreading pollutants through the air to nearby water sources, as well as homes and impacting those nearby who breathe it in. (Exhibits G, H, N, O).

138.    Roadspreading of conventional well brines is a nuisance *per se* because of its high to near-certain potential for pollution of waterways (including with radioactive material) used by DCS members or on which they rely for recreation and businesses, as well as adverse impacts to human health and nearby land, including areas owned or used by DCS members. (Exhibits G, H, N, O, Q).

139.    The DRBC's extra-regulatory exemption for conventional well brines directly conflicts with and undermines Pennsylvania law by allowing a nuisance to occur and sets a regulatory floor lower than the law of its signatory parties.

140.    In addition, DRBC's allowance of oil and gas waste and wastewater into the Basin creates risks of spills, leaks, and other releases to the environment in the Basin, which was not present before, contrary to the point of pollution control laws, which is to prevent such pollution from occurring in the first place rather than attempt to clean it up later. See Machinpongo Land & Coal Co., 799 A.2d at 774 ("The key to protecting our water is to prevent pollution from occurring.").

141.    Under Pennsylvania law, a violation of constitutional rights can also constitute a nuisance. Everett v. Harron, 110 A.2d 383 (Pa. 1955).

142.    Separately, the DRBC's regulations and extra-regulatory exemptions directly undermine and infringe on the property and environmental rights of DCS members, particularly those in Pennsylvania, by introducing real and substantial risks to their health, places they live, work, and recreate, and their investments in their

38

communities that the Pennsylvania Constitution protects against and which residents

did not have to face prior to the DRBC new rules. Pa. Const. Article I, Sections 1 and 27;

<u>Pa. Envtl Def. Found'n v. Com.</u>, 161 A.3d 911 (Pa. 2017); <u>Robinson Twp., Del.

Riverkeeper Network v. Com.</u>, 83 A.3d 901 (Pa. 2013); <u>see, e.g.</u>, Exhibits G through I, N

through Q.[35]

143.    Again, the DRBC cannot set a regulatory floor below that of any of its

signatory parties, including the very bedrock documents – state and federal

Constitutions – that protect against government infringement of inherent rights.

WHEREFORE, DCS respectfully requests that this Court enter an order: (1)

declaring the DRBC's extra-regulatory exemptions void as *ultra vires* and thus in

violation of the Compact; (2) declaring that the regulations to be followed consist only

of the regulations set forth in the revised Water Code, revised Part 440 to Title 18 of the

U.S. Code of Federal Regulations, and the revised Water Quality Regulations; (3)

enjoining the application of any of the extra-regulatory exemptions; and (4) (a) directing

the DRBC to conduct a rulemaking to prohibit importation of oil and gas waste and

wastewater into the Basin; and (b) prohibiting the importation into the Basin of all oil

and gas waste and wastewater until the DRBC completes a new rulemaking; or in the

alternative, (c) prohibiting the importation into the Basin of all oil and gas waste and

wastewater.

---

[35] Compendium of Scientific, Medical, and Media Findings Demonstrating Risks and Harms of Fracking and Associated Gas and Oil Infrastructure, April 2022, Eighth Edition of https://psr.org/wp-content/uploads/2022/04/compendium-8.pdf.

## CONCLUSION

WHEREFORE, DCS respectfully requests that this Court grant the declaratory and injunctive relief requested herein, and issue such other relief as the Court may deem proper.

Date:  January 6, 2023

Respectfully,

s/ Lauren M. Williams
Lauren M. Williams, Esq.
For Greenworks Law and Consulting
LLC
Pa. I.D. No. 311369
8 Atkinson Drive #1746
Doylestown, PA 18901
Phone/Fax: 267-360-6188
Email:
lmw@greenworkslawconsulting.com

*Counsel for Damascus Citizens for Sustainability*